We'll hear argument first this morning in Case 10-1121, Knox v. the Service Employees International Union. Mr. Young. Mr. Chief Justice, and may it please the Court, before addressing SEIU's motion to dismiss for mootness, it is important to remember the underlying facts of this case. For 10 months in 2005 and 2006, more than 36,000 nonmembers, or nearly 40 percent of those employees represented by SEIU, employed by the State of California, were compelled to contribute to SEIU's $12 million political fight-back fund, without being provided the opportunity to challenge the amount of the fee and to object to its exaction required by the First Amendment. Adding insult to that injury, the Ninth Circuit said that nonmembers could never say no to contributing to SEIU's political expenditures for ballot propositions, at least Proposition 76. They have no right to refuse to bankroll that element of SEIU's political speech. This defies this Court's decisions, distorting the political process on a massive scale. Kagan. Mr. Young, could I ask you to speak to the mootness question first? Just a direction of that. As I understand your brief, you're essentially saying that it's impossible to moot a claim for nominal damages. Is that a correct reading of your position? Young, I'm not sure I would go that far, Justice Kagan. I think in this case, the wishy-washiness, as it were, of the language used by SEIU when it distributed this pasted-on dollar to the class, or dollars more clearly, was inadequate because it failed to represent the importance of the judgment that the nonmember class had won. So that's a different point, right, which is that the notice was inadequate. That was incorrect. And when you say inadequate, I read you to be saying sort of not apologetic enough, in other words, not saying, look, you had a claim against us, we think you're right, it was a valid claim, here is your judgment in satisfaction of that claim, that it didn't forthrightly say that. But do you think if it had forthrightly said that, we would be living in a different Article III universe? Not in this case, Justice Kagan. Turning to the adequacy of the notice, the financial disclosure, that did not comply with the district court's judgment either. If the only question were the distribution of nominal damages, then perhaps we would be living in that different Article III universe. But this case is about the judgment of the district court that the SEIU was attempting to comply with. They failed to do so in virtually all of its elements. And how is that? How did they fail to comply other than, you know, the question of whether they were forthright enough about the fact that they were satisfying a claim? The district court had ordered or described the type of notice that it anticipated. The district court specifically determined that SEIU's subsequent 2006 financial disclosure was inadequate to cure the problem that was caused by the seizure of fees starting in September 2005. And that's on 73A of the Petition Appendix B. The union in this case merely sent the same financial disclosure in the notice that it sent to try to boot the case that it had sent in June of 2006. Well, the district court had already said, this is inadequate. That seems to me to end the inquiry. Obviously, the district court did not contemplate that the notice that was sent in June 2006 satisfied the obligations of its judgment, else it hardly could have ordered a useless act in ordering a new type of notice go out. And the reason that's important in terms of the content of the notice, the inadequacy, is what? The reason that is important, Justice — Mr. Chief Justice, excuse me, is that the SEIU is asserting that the case has become moot because it has now complied with the district court's judgment. It has now— I thought your argument was that a different type of notice would have resulted in more members electing to opt out, to demand the refund of their assessments. And that's certainly one of the possible consequences. Obviously, I — we would — that's speculative to some extent. But since the purpose of the notice is to provide the information necessary to — to object, one of the purposes, then we certainly anticipate that there would be more objectors were there to be an inadequate notice that complies with the district court's judgment. Alitoso, if the special assessment requires a different kind of notice and possibly a different kind of opt-in or opt-out regime, would the case be moot? If the note — I'm sorry, I didn't understand. Well, we're not dealing here with the kind of notice, with the typical Hudson notice given at the beginning of the year when the annual dues are collected. We're dealing with a special assessment. Now, if a different kind of notice is constitutionally required in that context, would this case be moot? No, it would not. Obviously, we have — we still have the nominal damages question and the adequacy of the payment. My question is whether the different requirements, which presumably were not met here in the context of a special assessment, if there are different requirements in that context, would that be enough to preserve this case as a live controversy? So long as the union failed to provide them, and at least in this case, the district court's judgment we believe provides an adequate respect for Hudson's underlying requirements. Mr. Young, as I understand it, the union recognizes that a consequence of mootness would be that the Ninth Circuit judgment is vacated. Now, if the union would also recognize that that means the district court judgment stays in place, so if the Ninth Circuit judgment is worked out and you're left with the district court judgment as per the law of the case, then I think it is moot, isn't it? No, Justice Ginsburg, and this is why. The union would remain free to return to its old ways. The very type of reason that this Court declined to find mootness in W.T. Grant, the union has made much of a showing, or much of a show, more accurately, of the fact that it's changed its internal policy. It won't do this for 180 days, but that can hardly be sufficient for this Court to The union made this wonderful and meaningful policy change on 6 days' notice. But it wasn't this case is about a completed episode. It's about a special assessment that is long over. Well, that is true, Justice Ginsburg, but it is also about the declaratory relief that was ordered by the district court. It is about the – which was virtually injunctive relief in this case. It is also about the effect of that judgment for future activities and how that will affect the way SEIU operates. Are you saying that this is capable of repetition, yet evading review? I'm not quite sure. It would certainly be so in this case, Justice Kennedy. The union set a very short time – well, a relatively short time period, given the length of time a case comes up from the courts as a rule in this court. Does the injunction have future terms? Is it a permanent injunction, or is it just an injunction that relates to the notice that's required in this case? Just to be clear, there is a – I'm talking about something as tantamount to an injunction, Justice Kennedy. It wasn't actually phrased as an injunction. It was an affirmative – an act ordering an affirmative act. But isn't that important, Mr. Young, because usually where we've talked about capable of repetition or where we've talked about the same thing could happen again, it's where an injunction has been before us, rather than a suit for damages as to a past act. Yes, Justice Kagan, I think that has been generally the case. I – in my research, I could find very few cases where it wasn't clear to me that this Court was addressing injunctive relief. Hudson itself, it seems to me, did not specifically discuss the entry of injunctive relief in the lower court, and Hudson itself addressed a mootness issue. I mean, if we – if we talk about these cases in their strictest sense, the union's notices are all annual. So by the theory that it becomes moot when those notices expire, or potentially moot when those notices expire, this Court would never address these issues because it would all – I can't imagine one of these cases ever getting up to this Court in – in as little as a year. But the – this Court in Hudson, in foot – I believe it was footnote 12, said that this Court reviews the policy, the procedure, the acts as they were defended in the district court. And therefore, cases like this should not become moot because it is capable of repetition and would be evading review simply by the mere limits of how long these policies and procedures are in effect. Kennedy, it seems to me, Justice Kennedy, it's implicit in – in our argument, although clearly our – our main point in that argument is that this is a – a – a paradigm case of voluntary cessation of allegedly unlawful activity. Until cert was granted in this case, until the Petitioner's merits brief was filed, SEIU was vigorously defending its practice. It remains free to impose that practice. Ginsburg. That's another – something quite different than the capable returning to old ways, because here we do have a discreet episode that's over, and there was no question that even though, what was it, in 2005, the period in 2005-2006 when the special assessment was in effect, that was long over, but you were continuing to litigate it. Nobody suggested that it would become moot simply because the period was over. That's – that's true, Justice Ginsburg. Pardon me. This argument – this argument was not raised until we were before this Court, the union's argument that the case had somehow become moot, and until it issued a notice. Well, they said it would become moot because they gave you all the relief you requested, so there was nothing left to the case. Well, all the relief, Justice Ginsburg, implies that they had complied with the district court's judgment. As to the notice, we believe that they have not, and we believe that's clear because of the very fact that the district court rejected the 2006 financial disclosure as adequate. And the other point is that the district court rejected the 2006 financial disclosure as adequate. Maybe it's a good point for you to move to the merits. Yes. Thank you, Mr. Chief Justice. Could I ask you a question about the merits? Yes. I certainly do. Are you attacking the normal system of basing assessments moving forward based on past accounting and chargeability and nonchargeability, or are you just attacking the special assessment? I appreciate the question, Justice Sotomayor. No, we are not attacking the normal Hudson procedures. So articulate for me, what's the – borrowing a phrase from one of my colleagues yesterday, how do we write this opinion? When is a second Hudson notice required? Let's presume, for the sake of argument, that the union had cost overruns. Labor salaries went up, printing costs went up, not for lobbying, but generally there was a 10 percent increase in their expenses across the board because various contracts that they were involved in required it. Would you require a second notice in that circumstance? Yes, Justice Sotomayor. We would – we believe – pardon me – that a new Hudson notice is required whenever there is a material alteration in the obligations that are imposed upon nonmembers. The values that this – Articulate that again. A material change. A material increase or increase in general terms in the obligation imposed upon the nonmembers. In this case, I don't think anybody would dispute the 25 percent. A material new assessment. A material new assessment, yes, Justice Sotomayor. We are talking about money here, right? Yes, we are. Okay. It's certainly – But without regard to the reason for the assessment? I think as a matter of principle, I would have to say yes, Mr. Chief Justice. The nonmember – Well, I'm not sure that – this may just simply be repeating Justice Sotomayor's question. But if they say we have to raise the assessment 10 percent because, as she said, we estimated the printing costs for the union newsletter, whatever, was going to be this, and it turns out they raised it, it's going to be that, so we know we're going to have to get additional money for things that are indisputably chargeable, why do you need special procedures in that case? Well, it wouldn't be so much a special procedure as a new opportunity to object and challenge the amount of the fee, Mr. Chief Justice. Certainly, one of the elements, and we recognize, of course, that the primary reason individuals object is political expenditures. But this Court said very clearly in Abood that people can object for any reason, for no reason, for a good reason, for a bad reason. Nobody can inquire as to why someone objects. And certainly when a material alteration – there has been a material increase in the obligation imposed upon nonmembers, they may choose to make an economic decision that heretofore they chose not to make. They may choose to minimize, particularly the nonobjectors, they may choose that they want to minimize the financial obligation that they are paying to the union at that time. And it's peculiar because in the circumstance where the extra assessment is all going to go to chargeable activities, in fact, that means, economically speaking, the following year, the objector will be better off, not worse off, because there is a higher percentage of the total fee that's being paid to chargeable activities. So this special assessment that Justice Sotomayor and the Chief Justice were talking about is one that will benefit the objector if he keeps quiet and says nothing. So it's a little hard to imagine the frame of mind that would say, I need the notice because now I might object, whereas I wouldn't have before. Well, Justice Breyer, the reason for the notice is these people may not trust the union. They may choose to challenge the amount of the fee. Breyer, I see that point. Can I ask you, if we're going to pursue that further, are we? Go ahead. All right. Let me give you this example. Sure. Now, but I think I see what your answer is. Imagine it's year 2. In year 1, expenditures broke down so that it was 70 percent chargeable, 30 percent not chargeable. Got that? Yes, sir. And normally under Hudson, that means in year 2 the deal is the objectors pay 70 percent. Right? Yes. In the middle of year 2, surprisingly, something comes up. Something comes up. Unsurprised, surprised to the union, and they want to have a special assessment. And you're saying they just can't without going through this procedure all over again. That would be correct, Justice Breyer. And we're not talking about the union. And take the money that they collected. I'm sorry. Can they take the money that they collected under the first notice and instead of doing a special assessment, in the middle of it this campaign gets announced by the governor. And can they then divert the chargeable amount that they had predicted and spend it on the nonchargeable amount? Or are you or does that require a second Hudson notice without a special assessment? I understand, Justice Sotomayor. And under that case, I don't believe it would. All right.  The rule is that where there is a special assessment and it will make all the objectors better off, they have to have a special notice that they can object. But where the rule is that we're going to take money we already collected from them and spend it for a totally political purpose, we don't give them a special notice and they don't have to object. Now, that seems totally backwards, but I understand why you get there. And my suspicion is, which you can confirm, is that's the only administrable system you can think of. And if you concede that it's going to make them better off, I would assume that that's your principal objection. They don't know whether this new assessment is indeed going to be divided the way the original one was or not. They might want to challenge whether it's all going to be used for assessable activities or not. And they have no you're telling me they have no. At the very least, they have to make an interest-free loan to the union until such time as they can challenge it. Well, that's exactly correct, Justice Scalia. I understand. Breyer. But the hypothetical, if I could continue with it, is perhaps unrealistic, but they have 20 bishops and 14 most honest people in the United States, and they've all absolutely guaranteed and everybody agrees that this goes to chargeable activity. And where I was going with my question, which you see where I was, you're with me on this, right? Yes, I am. And combine the two, what I'm trying to point out and get your response is that you've been forced into this position to create a workable system. Now, why is that workable system one whit better than the workable system we already have, which is all this washes out in a fair manner the following year, that there is an inevitable year's lag, it doesn't work perfectly, but it's as good as any other, and all we have to say is it's better than yours. Now, why is yours better than that? Well, I recall the bishops from the last time I was here, Justice Breyer. I think they made an appearance then. They're useful to me. They are, I'm sure. I assume we wouldn't need a Hudson notice at all if bishops affirmed all of these things, right? You anticipate my next point, Justice Scalia. These aren't bishops, and with due respect to our litigation opponents in this case, these are people that nonmembers don't trust. These are people with whom nonmembers do not wish to affiliate. And these are people that the nonmembers do not wish to support. The problem is in this system, and going back to Justice Breyer's practicality, they will get a chance to object. It just won't be at the moment of the special assessment. It will be the following year. So when the union gives its new notice, it's going to set forth its chargeable and nonchargeable amounts as audited, and it will say, as it did as it's done in the briefs before us, on Proposition 76, we're going to take 50 percent as chargeable. And the union members can come in and give a Leonard objection. Those who want to, those who don't, know it's happened, and they agree to it. Isn't that correct? They do get a chance to object. The question is the timing. Then the problem is, Justice Sotomayor, understanding the fact that Is there an answer to that? They will get a chance to object then. Well, they'll get a chance to object after they've already paid the interest-free bond. Sotomayor, if that's true of the first example I gave you, if something happens in the middle of the year and the union needs to divert already-assessed funds to challenge an election, they can do it, and you said that's okay. And the nonmembers would have the chance to challenge that, but it would be within the normal system of ordinary union dues. We, and I believe this Court in Hudson, presume that any reasonably competent union management would have relatively stable expenditures over the years. Isn't the premise of Hudson that you give the notice before, before you receive the notice, before you have to cough up the money? Yes, Your Honor. And what's now proposed is, well, if there's an additional assessment, you cough up the money first, and then later you straighten it out. Do you get your interest? That seems to me to be the problem, Justice Scalia. The people who got the June 2005 notice were left in the dark. Indeed, the union may have been in the dark as to this special assessment. But once the union agreed to or decided to impose the special assessment, the union was required by Hudson's principles to shed some light. Perhaps it is less predictive, less accurate to say we intend to spend the money this way, but when you have an assessment which is purely intended for politics and that's what the union said, to create a political fight-back fund, that's not, you know, counsel's business. Breyer. Breyer. Does your Hudson notice tell you about what's going to happen next year? I thought your Hudson notice told you this was the breakdown for the last year, and as far as we can tell, that's what it will be next year, but things could change. What does the Hudson notice tell you? The Hudson notice provides you with an opportunity to object and some assurance because of the audit requirement. But am I right in my description of it? I think that would be a fair description, Justice Breyer. All right. Do they carry over from one year to the next, or do you have to refile your objection to the union expenditures every year? Most unions, Mr. Chief Justice, require an annual objection. Now, of course, there would be nothing we find nothing wrong with an annual challenge requirement if you choose to challenge that year's figures, because obviously it's a specific event. But most unions seem to require annual objection, so you have to say again and again, I don't want to pay for your politics. That's how ratings work. Sotomayor, going back to the forget-about special assessments, I think in one of the briefs, I know in one of the briefs, someone says elections happen every four years. So in the normal cycle of union activities, in an election year, they're going to divert more of whatever accessible monies they have to their lobbying efforts, and the following year they'll go back to normal for three years. You're not challenging that normal variation in the distribution of the monies, correct? Correct, Justice Sotomayor. And that, too, may vary from union to union, from State to State even, as some of the justices I'm sure know. Virginia, we have politics every year. The problem is, I don't see how that, given your argument, is any less alone than this special assessment, where the labor, where the objecting members at the end of the year will get notice of what has happened that year, will have an opportunity to place their challenges and get them ruled upon, and will, as Justice Breyer said, have a benefit because they're going to either pay more of the Leonard Challenge or pay less if the Leonard Challenges are upheld, or pay more if they're not. But I'm not quite sure how this is a different loan. Well, we disagree with the union's characterization of its supposed benefit. But, Justice Sotomayor, I see my time has expired, and I'd like to reserve a balance for rebuttal. I will try to address your question more thoroughly when I stand up again. Thank you, counsel. Mr. Collins.  Justice Ginsburg is absolutely correct that what we have suggested to the Court is that the court of appeals decision be vacated with the consequence of reinstating the district court judgment. Why did you give up once the case was granted here? You didn't consider that until the case came before this Court. That's correct, Your Honor. And the reason for that is when the events in this matter were new and the then-union officers' actions were being challenged, the instinct was we're going to defend the case. And as time went on, there was no rethinking of that situation. When the case was granted here, over our opposition noting that we didn't think the questions presented were really presented, the officers of the union, who are not the ones involved in the original case, thought about the situation and came to the realization that they have no stake in the procedures that are at issue here. This is a local that had never done a midyear increase in the past. The what was contemplated as a temporary increase here turned into a permanent increase. The dues went up to 1.5 percent of salary a year after this increase ended. Alito, what is this local and what will the other locals do in the future when special assessments are made? Will they provide notice or will they go back to the old system? This local, and I won't belabor the term special assessment at the moment, but when we get to the merits, I think there's a misunderstanding around that, Justice Alito. But this local has put in a procedure which, frankly, would satisfy the Petitioner's concerns for the future if future conduct was legitimately at issue here. But it is not for two reasons. First, when we state that the district court judgment would be reinstated, that's a judgment that was not appealed by the Petitioners. That defines the limits of what they can attain from this case, whatever this Court may decide. And that decision gives whatever protection it gives against future conduct. Now, it gives essentially none for a very good reason. This was a case, as has been noted, brought only about a one-time event. There were no allegations of an ongoing practice. There was no request for declaratory or injunctive relief to prevent it. Kagan. Kagan. But, Mr. Collins, as I understand Mr. Young's argument, there is a serious dispute about the adequacy of this notice. And it might be a dispute about whether it was clear enough about that it was satisfying claims, or it might be a dispute about whether it allowed refunds easily enough, but that Mr. Young is contesting whether the notice complied with the district court's order. Now, as long as that's true, don't we have a live case before us? Somebody has to answer that question about whether your notice complied with the order. And if it's the case that a court has to answer that question, doesn't that depend on the questions presented here, the substantive questions? No, it doesn't, Justice Kagan. And the Court's explained in a number of cases, beginning with Walling v. Ruder and also obviously Munsing Ware, U.S. Bank Corp., a case can be in a posture where this Court, in disposing of it, needs to grant certain relief, clarification of the status of prior orders, and yet the case is moot on the merits, such that the Court cannot appropriately reach the merits. That's what we have here. If there is a dispute, and I'll explain in a moment why there really isn't, but if there is a dispute, for example, as to whether an individual failed to get their refund because the notice was inadequate, that dispute is not affected by and requires no decision of this Court. If the district court judgment is reinstated, then the question of whether we have fully provided all relief called for by that judgment, which we believe we have, would be before the district court for decision. It's not affected by. Roberts. This is not an incidental matter. I mean, the whole point of your friend's argument with the Hudson notice is they want people to understand what's happening with their union money. And they say this notice didn't let people know that. And if the case is not moot and if they prevail, they will have a right to be heard on what the notice should say, and that will make a difference in how many people opt out or how many people don't. And I guess I'm following up on Justice Kagan's question. That's a very important part of this case, what the notice is going to say. And if we accept your view that it's moot, that issue goes by the wayside. I think that's incorrect, Mr. Chief Justice, for two reasons. First of all, the district court required a certain kind of notice to be given. We are stating the district court judgment should be reinstated. If the notice we have given does not comport with what the district court judgment, which was not appealed by the Petitioners, requires, it will be provided by the district court. We are not contesting. The Petitioners are looking a gift horse in the mouth. We are not contesting the district court. Roberts I don't see how that works. The notice is only required by the district court if the case is not moot. If the case is moot by the notice you sent out, the district court doesn't have a case on the basis of which to order a different notice. I don't think that's correct, Your Honor. A case can be moot in this Court, and this is what I believe Munsonwear, Walling v. Ruder, and the other cases, U.S. Bank Corp., more recently, explain. And at first it seems paradoxical, but it is not paradoxical. A case — there can be remaining issues potentially in the district court, such as whether the check that the plaintiff paid bounced or not. That could potentially have to be resolved by a district court. And it — but it means at least in terms of prudential mootness, there is not a substantive merits issue remaining for the court to be deciding. And it's really quite simple. The Petitioners, as I say, are looking a gift horse in the mouth. The apex, the acme that they can achieve in this case is what they got from the district court and it was reversed. We are saying give it back to them. Take back the reversal, reinstate the judgment, whatever they won, they will have. We believe we have already given them everything they won. If we have not, the district court will do that. But let me explain the second point, if I may, Mr. Chief Justice, which is that there is no legitimate issue here about whether the notice was adequate. Mr. Young stated quite incorrectly that the notice we have provided is the same as the notice the district court struck down. That's absolutely incorrect. The district court said that the 2005 notice issued before the dues increase obviously did not give specific notice of the dues increase, although it stated that dues could be increased. The district court specifically held at Petition Appendix 73A that the 2006 notice, which described the so-called fund and the dues increase and the purposes of it, was completely adequate. And the notice the district court one also has to realize, the district court was requiring the union to refund only the non-chargeable portion of activities attributed to this increase. A certain kind of notice would be needed for that to justify how the union was computing what it was saying was the chargeable portion to refund. But what the union has done here is provide greater relief than the district court ordered. We have refunded every penny that anyone who requests had paid during the increase. So there's no serious question that the notice that the union sent out, which explained what the increase had been spent on, sufficiently informed individuals as to whether they now want to get back every penny, as we've offered them, of what they paid under the increase. Roberts, I want you to move to the merits, maybe a good time to do that. Fine. Turning to the merits. Sotomayor, I just want to clarify a point. I thought I heard, and maybe I just didn't look at the union regulations, the new ones. Is it limited to 180 days? I thought I heard your adversary say that the ---- It has a provision that it can't be repealed without a 180-day notice. There can't be a sudden repeal of the new procedure. I see. But I do want to make clear, we think nothing ---- our position on mootness is not dependent on the court determining that the new procedure will be in effect  Our position---- Sotomayor, could you tell me what the burden is on a union to give a second Hudson notice whenever there is a special assessment? I mean, do you happen to know how frequently unions impose special assessments and what the incremental cost is to the union of giving such notice? That requires a fairly extensive answer, I believe, Justice Sotomayor, partly because I believe the word special assessment is being used here with a meaning that doesn't correspond to what this union did. I can say this much. There's never been only one other case in any Federal court that I'm aware of, and only in a district court. There's been no other appellate court dealing with any kind of assessment, temporary dues increase, and how it affects Hudson rights. So this is a non-event in the real world. There are no challenges that have been made previously to any kinds of assessments or increases. But unions use assessments in two ---- in many different ways. And let me contrast one way with what happened here, and I think it will show why there's no serious question here about a need for a notice. Some unions have a due structure which covers only certain kinds of activities, and they contemplate a new kind of activity that they would not normally pay for out of dues or fees. They say often with a vote, which was not required here, there was no vote required or taken here of bargain unit members for what occurred in this instance. But you may have a union that says we want to make a kind of expenditure that's really unanticipated, it's not what we normally do with our dues, we're going to put it to a vote, if you approve it we'll collect it, we'll probably put it in a segregated fund separate from our treasury. That kind of an assessment can raise potential issues, I would acknowledge, under Hudson. It's worlds away from what we have here, because all that happened in this case was that the union increased from 1 percent to 1.25 percent of salary, the regular membership dues and the fees based on those dues that were deducted by employers and paid into the union's general treasury. Alito, is it incorrect that this was for what was termed a political fight-back fund? It was. Some union communications described it as having that purpose. The October 27th letter, which was the most detailed explanation, said it had two purposes, basically to fight back at the bargaining table and to fight back politically. But what's essential, Justice Alito, it was never suggested, nor was it ever the case, that this money would be in any way segregated, treated as a separate entity, so to speak. So we have the Schermerhorn problem here, that basically Petitioner's position is based on the fallacy exposed in Schermerhorn of trying to take part of a unified general treasury and treat it as if it were a distinct entity. Let me give you this example, and maybe you'll say that this is different from your case, and the rules should be different in these two cases. The annual dues for particular — for members of this union are 1 percent of their salaries, and let's say that amounts to — or it's a certain percentage of their salaries, and let's say that amounts to $500 annual dues. And let's say that in the prior year, 90 percent of the money collected by the union was used for chargeable purposes, 10 percent for nonchargeable purposes. So someone who objected, a nonmember who objected, would be able to get back $50. Now, during the course of the year, the union levies a special assessment or whatever you want to call it, and for this, 90 — the percentages are exactly reversed. 90 percent is for nonchargeable, 10 percent is for chargeable. So now, a nonmember who potentially wants to object has $450 at stake. Now, in that situation, why shouldn't there be separate notice? Aren't the economic incentives quite different? McAllister, if I understand the hypothetical, there could be a problem there if the assumption is, then, that the union really is beginning a kind of spending that's really foreign to the way it spent money in the past. What needs to be explained here, though, Justice Alito, I don't think one would guess from anything that's been said today that we're talking about a period of time when the union's chargeable spending increased and its nonchargeable spending decreased. We're talking about a period of time when objecting nonmembers did not even pay their pro rata share of the concededly chargeable expenditures, meaning they did not pay one penny for any political activities. Alito, as I said, my hypothetical may be very different from what happened here. And maybe it's an unrealistic hypothetical, and you can answer that. But if it were to occur, should there not be Hudson notice? McAllister, it would be a closer question, but I think not because, again, it would be caught up in the subsequent year. Alito, but what if the money is going to be used for an election campaign? What if it is going to be used to weigh in, in favor of one gubernatorial candidate against another, in favor of one slate of legislative candidates against another, and on those issues, the nonmembers may have very strong partisan and ideological objections? So why should they not be given a notice at that time? And given the opportunity not to give what would be, at a minimum, an interest-free loan for the purpose of influencing an election campaign? It would depend, Justice Alito. I think in your hypothetical, one might be able to say, there might be more facts needed, but one might be able to say that what was occurring is something that could  In this case, however, and this is crucial to this case, the notice in 2005 told every nonmember that of our $38 million budget, we spent 43.6 percent of it last year on nonchargeable activities. And if you do not object, we will spend whatever amount out of our roughly $40 million budget in the coming year on various activities as we perceive the need, including specifically ballot initiatives, which were specifically mentioned in the notice as one of the things the union spent its money on. Now — I thought your point was that this was a very special ballot initiative. That's what the literature suggests, that this was not sort of the normal run in the courts. Every two years, every election cycle, we spend something. That's why it's a special assessment. Well, I don't — I wouldn't call it a special assessment if one uses that term as it's usually used, to mean a very short-term assessment apart from general union functions for a new kind of function. No, it's not short-term. It's just until November 7th. But it's nothing new under the sun, Mr. Chief Justice, and we can see that. For example, the record reflects the audit for 2005 shows us that in addition to the money that was attributed to the dues increase and spent in opposing these ballot propositions, additional money, approximately $2 million, was spent on those same purposes from the pre-increase dues. So ballot — opposing ballot initiatives is nothing new for this Court. Breyer. Can you think it for a second to go back to Justice Sotomayor? Now, I would like you to see, I think, why she asked the question. As I understand it, the way it works now is at the beginning of, say, September — September of year 2, we look back to year 1, and we see what the percentages was. And now we in the union calculate a budget for year 2, and we go and get approval or opt-outs on that basis. Now, what I thought coming in here is that the problem was going to be, if you have to have a new notice in the middle of the year for special political assessments, you're going to discover that half the time you don't know if there are special political assessments, it's an impossible line to draw, it's really tough. You're making the argument that however you draw the line, we're on the right side of it, not the wrong side. Isn't that basically what you're saying? It's not a special assessment, it wasn't really, et cetera. Okay. Now, but there's a new argument that's come along that I hadn't focused on, that we can avoid the administrative problem by saying all special assessments require a new notice, whether they're for political purposes or not. Hence the question that I was trying to get — I was very interested in your answer. If we had that rule which avoids the problem of saying which is which, how does that affect the union? Not necessarily yours, but unions in general. How often is it that you drop your budget for year two in September, just put it into effect, and then during the year you discover you need more money from people for any reason, and therefore you change what you thought they were going to contribute? How often, if you can give us an estimate and you're in a better position than I, does it happen a lot, rarely, a little? What do you want to say? And a footnote. And if it happens a lot, how burdensome is it? I will get to that, Justice Sotomayor. I have tried to determine how frequent it is, and I've been unable. All I've been able to determine is there's no litigation over it. How often — and I've been able to determine that so-called assessments take many different forms from, and I think there are crucial distinctions,  to the opposite extreme, what we have here, and what I don't think would be called an assessment, frankly, by anything I've read, a temporary dues increase, which became permanent, and which simply increased the total flow of dues and fees into the general treasury, and which went for the usual — the kinds of activities the union had always funded. And in that regard, there's one thing. Could you please answer my question? The burden. All right. The burden. The burden consists of two things, Justice Sotomayor. The — if a union has to give a new Hudson notice in a situation like this, whereas I've been trying to explain the spending that went on is really not different from what one would have reasonably anticipated, given the notice, then we have litigation and disputes about the need for new notices whenever any number of things happen, because one thing that happened here that is undisputed but hasn't been discussed is that collective bargaining costs were up six-fold in 2005 over 2004, and they were up six-fold in 2006. One — one reason — I mean, we're dealing with a situation where the union is compelling nonunion members to give them money for political activities. We allow, as I understand Hudson as I read it, because you can't figure out what that is, you wait until the end of the year. In other words, it's a compromise for administrative convenience. Normally, you wouldn't allow it at all. At least under the law as I read it, you would not allow people to take money. You would not allow the union to take money from people who don't want to spend it on political activities so the union can spend it on political activities. But we allow that in the course of the year because it's impossible, as you go on, to sort these things out. I thought the argument on the other side was when you have a special assessment, an additional charge, there you don't have the administrative problem. You can tell. It's 0.25 percent. So you can't take that until you tell them, do you want to object or is it happy — are you fine with having this spent on political purposes? The reason, Mr. Chief Justice, that it isn't that straightforward is, quite simply, that all of these questions about it's a special assessment, we can figure out what it is, we can treat it separately, flounder when one realizes that the so-called special assessment is simply a dues increase, because if I were to try to imagine — let's try to imagine the notice that could have been given. If I was giving a new notice in the fall of 2005 to explain to all nonmembers how things look now compared to how they may have looked when the Hudson notice was given, I would say the following, completely consistent with all the facts of record in this case as revealed in the audits. I would say we've determined we need more income. Part of this is because we anticipate $3.7 million in fight-back expenses this year. Another part is we expect more than $3.5 million of additional bargaining costs this year, and we expect a lot of other changes in our costs. On the Petitioner's theory, and this is why Schermerhorn is the complete answer to their theory, there's a constitutional violation if the union says, we're going to view this increase as paying for our additional political costs, and it's going to free up our bargain — our general treasury for the bargaining. That's a violation. But if you say, we're going to treat this increase as covering those new bargaining costs we told you about, that's going to free up our general treasury for the political costs. Roberts. But on the — I'm reading from the district court opinion, it said that this assessment would be used, and they're quoting from the union material, for a broad range of political expenses, including television, radio advertising, direct mail, voter registration, voter education, and get-out-the-vote activities in our work sites and in communities across California. And it further said, quote, the fund will not be used for regular costs of the union, such as office rents, staff salaries, or routine equipment replacement. But two points, Mr. Chief Justice. First, as the court of appeals pointed out, there were other statements that said the money would be used for both purposes. But as Schermerhorn points out, Schermerhorn says even if you specifically say, this part of our dues income is going to be earmarked for this purpose, it's artificial when you're dealing with a general union treasury, not a separate segregated fund, to give that separate legal status. And that — because that is why my point to you, Mr. Chief Justice, is nothing in the world would have changed here. Suppose that the — suppose that the proponents of Proposition 75 and 76 had come to the union and said, would you please give us an interest-free loan for money, because we want to use this money to — to persuade the electorate to enact these changes, but don't worry, because we're going to pay it back right after the election when we've achieved our electoral ends. Would the union provide the money, because it's all going to come out in the wash? Schermerhorn I really can't answer that question. I don't know. Alito Well, I — gee, I really doubt that you would — that they would. But what's the difference? If you look at this from the perspective of a nonmember who doesn't want those ballot initiatives to be defeated, saying that we're going to give you your money back, we're going to use your money to achieve a political end that you oppose, but don't worry, because we're going to give it back to you next year after we've achieved our political end. How does that solve the problem? Schermerhorn That's not the situation here, Justice Alito. The nonmembers were told in June 2005 in the Hudson notice that if you don't object, we may spend millions of dollars on political activities, including ballot initiatives. If a person didn't want to support that, they merely need to object. What then happened, and this is what gets lost in the messaging about the dues increase, what actually happened in the real world in the period that followed is that compared to the numbers in the 2004 Hudson notice, the union spent less on nonchargeable matters and more on chargeable matters, and the only reason there's a case here in the Court is that the union, for whatever PR purposes, whatever it may have been, instead of saying we're going to treat the increase as covering our vastly increased bargaining costs, thereby freeing up money for politics, we're instead going to describe this increase as being attributable to our political costs, thereby freeing up money for bargaining. But what the union is spending its money on is bargaining. More money. Kennedy, it seems to me that this answer is so confusing that the Court probably should consider whether or not an opt-in requirement is preferable. We're talking in the first exchange you had with Justice Alito, he gave you a very simple question, 90 percent, 10 percent, then it's reversed, special assessment for 90 percent political, and the point there was that you're taking someone's money contrary to that person's conscience, and that's what the First Amendment stands against. And you simply wouldn't answer that question. And then you say, well, maybe it's fungible, it's hard to. It seems to me that you're avoiding a very, very critical question on the constitutional rights of these objecting members. I won't avoid the question. I don't believe, I was not meaning to avoid it, Justice Kennedy. What I thought I said is if you are springing something on someone that's not anticipated in the notice that gave them their rights to object, then there's a problem. My point is very simple. Anyone reading the 2005 Hudson notice, if that person was asked, if I don't object, might the union spend $3.7 million next year on ballot initiatives that I may not want to oppose? The answer would be yes. The notice made it perfectly clear. Kennedy. Let me ask you this as a way of background. In collective bargaining negotiations, do the unions consider the, as one factor, the importance of ensuring that the government or employer has fiscal stability? That's generally considered, yes. Well, isn't that ultimately a political judgment, so that even collective bargaining involves a core political judgment? That's exactly what the Court said in Abood. And the reason that exclusivity and agency fees are permitted in serving an important government purpose is that the government has concluded that its interest lies in having an exclusive spokesperson with whom it can negotiate, so that it won't have an array of different employment relations. But you concede, then, in ordinary collective bargaining, there are critical and important political, significant political judgments that are being made by the union in the course of collective bargaining with chargeable expenses? Absolutely. And Abood explicitly says that. And Abood then says that, nevertheless, the government, we're talking about a regulatory scheme to promote the government's interest in orderly labor relations. The government needs to make arrangements and agreements on terms of employment. It has a vital interest in having an exclusive representational arrangement where that can be accomplished, and that the Court held in Abood, and it's not challenged by Petitioners, that justifies the degree of impingement that's inherent in the fact that, as Your Honor correctly says, all bargaining, particularly in the public sector, has political elements in it. Thank you, counsel. Mr. Young, you have four minutes remaining. Thank you, Mr. Chief Justice. Mr. Young, I hope this won't use up much of your time, but I do have a pressing question to make sure that we're just not spinning our wheels here. What if the union here had simply said, all of this additional assessment will go to bargaining activities, and then simply used its original assessment, the portion that had been anticipated to be used for bargaining, for political activities? It could do that, couldn't it? It's not committed to, you know, an 80-20 or whatever the division is, simply because that's what's given out in the first notice. It can indeed use its the anticipated portion for bargaining for political activities. It would be free to do so, Chief Justice. So why are we wasting our time? I mean, all the unions are going to do is say this is a general assessment for bargaining purposes, and then use their general funds for the political thing. Because the nonmembers still have that right to challenge, Justice Scalia. But they don't lose it. They're going to do it the following September. The attractive part of your argument from the beginning was that this is somehow a forced loan. And I understand the attractiveness of that, but it goes back to what Justice Breyer said from the beginning, which is, given, as has been recognized, that money is fungible and that you can't really often predict what's going to happen in the future, it's been developed a system that cyclically gets money to the people back. And money is fungible to a degree, Justice Sotomayor, and I respect that argument, but let's remember the facts, as we have them here. In the facts of this case, it was a segregated fund. There's a separate portion of, separate line item in the union's notice for both parties. Scalia, so you win and it will never happen again? It will never again be called a segregated fund for policy. I lose, Justice Scalia, and it will happen all the time, I'm afraid. No, but the problem, if you win in this case and then there is this other way of getting to the same result, is that the other way of getting to the same result, while permissible, is far less transparent, and people won't understand it, and it encourages a kind of slyness that seems highly undesirable. And the virtue of the present system is that it does require some forced loans. That's true. But it does wash out in the wash and it ends up being fair to the objectors And it's simply hard to think of a better system that doesn't provide more administrative problems than the existing one. So that's the go ahead. Thank you, Justice Breyer. I'm sorry for interrupting. I understand that, Justice Breyer. And for ordinary union dues, that's why when Justice Sotomayor asked me at the beginning of the argument whether we're challenging the ordinary Hudson system, I answered no, because that system is perfectly adequate for ordinary union dues. Sotomayor The problem is that I'm being told by your adversary, and since we don't know, I'm always afraid of writing a decision in a vacuum, okay, that unions structure their business in a myriad number of ways, that some have a very small due each year and a larger special assessment for special projects, and I assume there's endless variety. You're proposing a rule that every single time an assessment outside of annual dues is imposed, that a new Hudson notice can be given, and you're suggesting, Justice Scalia, that all they have to say is, we think it's going to be for chargeable effect. Well, the union, I'm sorry, I'd like to briefly counsel. Yes. Thank you, Mr. Chief Justice. So, Justice Sotomayor, the answer is that I'm saying it would be brief, and my friend, Mr. Collins, is saying that it doesn't happen that often, so the burden is minimal. Unions have other options than extracting this money from unwitting nonmembers, interest-free loans, internationals. And I thank the Court for its advice. Thank you, counsel. Counsel. The case is submitted.